This case will be 08-1549 and 1550. Ortho-McNeil Pharmaceuticals v. Teva Pharmaceuticals, Adderall. Mr. Trello. Thank you, Your Honor. May it please the Court. We're here on appeal from a summary judgment decision. Summary judgment, of course, requires that all material facts be undisputed. There are a number of undisputed material facts on this record. Would you mind if I hop you right to Claim 6 and the obviousness determination relevant to Claim 6? Of course, Your Honor. So tell me what the undisputed fact is on the obvious determination of original Claim 6. Original Claim 6, of course, is a comprising claim, so it permits other ingredients. So the difference between Claim 6 and the prior art is the ratio of tramadol to acetaminophen. And we have the Flick patent, which has the example 23 combination, has a 1 to 10 ratio. Aren't there other references, Mayor, and some of the others, Brinkman, I think, that deal with the wider ratio that would include the 1 to 5? Here's the problem with those references, Your Honor. Of course, those are the so-called German references. They do not teach a single composition comprising tramadol and acetaminophen. They talk about administering the two separately as part of a phased pain treatment regimen. And the key, Your Honor, is that they don't instruct that you necessarily administer the two ingredients at the same time. So if you're not administering at the same time, this mathematical exercise of taking 1,000 milligrams of this and comparing it to 50 milligrams of something else is meaningless. That's not a ratio that has any pharmacological significance. Okay, but can I get you to back up? So Flick discloses 1 to 10, and your claim covers about 1 to 5, which we've interpreted can go as high as 7.1 already. Correct. Okay, so Flick discloses a 1 to 10 ratio, tramadol to acetaminophen, and your claim is, say, 1 to 7.1. Correct. Literal scope. Okay, so what is your question of fact that is in genuine dispute? Well, the question of fact is, obviously, does the prior art teach in a consisting of claim like claim 6? No. It's not consisting of. You're right. I got myself confused. You're right. Comprising claim. Like claim 6, does it teach the about 1 to 5 ratio? We have expert testimony that it does not. I hope I tried to explain why the German references don't teach it. I don't understand. Hold on, though. Why is it not obvious? I'm certain you've read titanium metals and Merck and Richardson-Dix versus Upjohn. And, you know, we have consistently, unequivocally held that ever so minor variations in variable amounts like this don't avoid a promofacial case of obviousness. So, I mean, I guess I'm confused. I really thought that what you were going to go with was our expert and the synergy, the superadditivity. Is that not your argument on appeal as to why you think there's a genuine issue of fact on claim 6? Is there another argument apart from that? That's what I'm trying to understand. Well, there's the ratio difference and then, of course, the secondary considerations and the synergy produced. The ratio difference. But you can't just stand here and say 7.1 and 10 are different. Therefore, it can't be obvious. This isn't anticipation. This is obviousness. And we've got this body of case law that says when it's really close, you can't avoid promofacial obviousness by just pointing out a slight difference. You've got to tell us why that difference matters. So why does that difference matter? There's an assumption in your question that it's a slight difference. And there's no basis in the prior art to conclude that that is a slight difference. Did your expert say that there's some reason this difference matters? Our expert, I don't think he said precisely that to be candid. In fact, why don't we turn to the chart that you have on synergy. You have a beautiful table in the appendix on – Is that in the patent? You're referring to the one in the patent, Your Honor? Let me see if I can find this. What page is this on? It's a graph, a chart figure you have on. Is that the – Do you have a page number for me? I may have it here. Anybody? Anybody? Law clerks? A193, Your Honor? Bluebrief, somewhere? A193, perhaps? It also would be at the back of the Bluebrief if that's easier. All right. Back of the Bluebrief. I think I have the flags back there. No, apparently not. Here we go. Wrong brief altogether. Okay. Yes. Thank you. A193, synergy graph. Look at it. My reading of this graph is 1 to 10 actually produces greater synergy than 1 to 5. So if that's the case with this graph, and this is the only evidence of record, how is your expert's statement that it wouldn't have been obvious, but giving no reason as to why this ever so slight change in variables matters or would matter to anyone, why is that suddenly enough to avoid obviousness? Because if it is, don't you just hire an expert in every case? They just said, oh, no, it wouldn't have been obvious, and that's it. Well, Your Honor, the graph you're looking at, of course, is reporting the inventor's results. This isn't prior art. This is what the inventors discovered. So, sure, once they discovered it, it's obvious. It's obvious now. The question is, was it obvious back then? It's an ever so slight change in these variables along the lines of what we decided in titanium metal and Merck and all these cases. So I'm trying to ascertain from you why it's not prima facie obvious. And you could say it's because of the secondary considerations. I'm trying to understand your argument, and I guess I'm not fully comprehending it. Well, the secondary considerations, I suppose, the way I was looking at it is that they come into play after you decide whether or not it's prima facie obvious, and you look at the secondary considerations. But clearly we have those. Okay, so how is it that you've disputed the prima facie obviousness? Well, I don't know that I can expand, Your Honor, on my evidently unsatisfactory answer to your question. But what is your answer, though? The answer is that a person of ordinary skill looking at the prior art would not have been motivated to change the ratio from flix 1 to 10 to the about 1 to 5 in Claim 6. And where's the best testimony from your witness that kind of articulates why? Because the court found that his analysis was deficient, right? I mean, there were compulsory statements that were written back up. Is there anything in the record in his testimony that you'd like to point us to that's put some meat on the bones that the court found was deficient? Well, it's in the expert report that Judge Liflin found inadequate. It was in the 2007 ruling in Dr. Stansky's original expert report that addressed Claim 6. Do you have a cite? I don't have the cite at my fingertips. Because I've got Stansky's original report here. I've got his supplemental report. I've got them tabbed up. And I couldn't find anything other than a very, very high-level statement that suggests it wouldn't have been obvious to change the ratio, but no reason why. Nothing at all to suggest why people might have been held to this. As you can imagine, I'm a little nervous about the idea of letting an expert just say it wouldn't have been obvious without giving me a reason. No, I understand that. And here Dr. Stansky did explain that these drug interactions are not predictable. In particular, the interactions between tramadol and other drugs are not predictable. It's an atypical opioid. It doesn't behave like other opioids. He considered that, I think, the support, the backup for his statement that you don't just go around fiddling with these ratios in this field. This is not like electrical engineering or mechanical engineering where you have known components and they behave a certain way, and they're going to behave a certain way when you put them together. In this field, chemistry and pharmacology, these things are not predictable. Known components do not produce necessarily predictable results. And, you know, fiddling with things like ratios, even though it may appear to a layperson as slight, and even though with the hindsight and the guidance provided by the patent, you may conclude, oh, that wasn't that big a change, that's not obvious at the time. Well, show me where Dr. Stansky says that tramadol in particular was unpredictable in all this, because certainly chemistry is known to be unpredictable. That doesn't extend to absolutely everything, right? Sure. A tiny little variation in whether 25 milligrams of acetaminophen or 26 isn't necessarily going to make any difference to anybody in anything. So it's not every single minute change gets the benefit of that notion of unpredictability. Well, I can give you some references, Your Honor. Page 1928, page 1930 of the appendix, he's talking about the characteristics of tramadol and how it's not typical of other opioids. 3960, paragraph 24, 4365, 4369. And he, at 3963, paragraph 31, he says, because of all of this, a person will I hate to do this to you. I know you have such a little amount of time, but you're going so fast, and I just can't get to any of them. Let me run through those again, Your Honor. 1928. Page 1928, which paragraph? I'm going to get worse and ask you which words. 1928, if you look at paragraph 18, it talks about the it's a unique drug exhibiting both opioid and non-opioid activities. That doesn't suggest that it would be so unpredictable that one with skill in the art would never have made this kind of ever so slight change that we're talking about. If you look at 3963, paragraph 31. 3963, no, no, that's the second declaration. That was not before Mr. Judge Lifkin when he was making this decision. Right, paragraph 1930. I agree, the second declaration, much more detailed. Much better for you. Right, right. I'm glad to hear that, Your Honor. 1930, paragraph 22. Again, it expands on the characteristics of tramadol and the None of this suggests there's a problem with unpredictability associated with slight changes in dosage or any of that. I guess you're, boy, you're not just looking for inferences. You're sort of looking for language that isn't there. Well, he's not, no, if your question is does he specifically say if you change the ratio by, you know, some percentage or by more than some percentage, it's unpredictable. No, he doesn't say that, Your Honor, in all candor. What he talks about is in general the unpredictability of pharmaceuticals and tramadol in particular because of its atypical characteristics. Does he even make the last conclusion, which is it would have been, at the time it would have been so unpredictable that one of skill in the art would not have been motivated to make this combination. Not just one wouldn't be motivated to make it, but because of the unpredictability of tramadol, one would not be motivated to make it. Does he ever say that anywhere? I believe he does, Your Honor. I believe his conclusion was that Which page was that? If you look at 1931, this gets to, this doesn't quite get to your point. I was looking at paragraph 24, but there he's talking about basically increasing the amount of tramadol, and if somebody of ordinary skill in the art would not do that, which is what, of course, you would have to do to be changing the ratio. Or you could just decrease the acetaminophen. But anyway, I'm using up all your time. Well, it's all gone. I think it's about time to hear from the other side. We will return your poll rebuttal time. If I might just make one more comment, and that is having to do with the other claims, which Dr. Stansky's expanded declaration applies to, as Your Honor pointed out, and those are consisting essentially of claims, which are, of course, more narrowly focused on just tramadol and acetaminophen. Why don't you hear from the other side? All right. Thank you, Your Honor. Jim Hurst on behalf of CARICA, and may it please the Court, we've agreed that I'll take all 15 minutes, so I won't be stopping at 12. All right. The claimed invention in this case is really nothing more than combining it to a single tablet. Why don't you start with anticipation? Because I'm trying to understand where Flick discloses the one-to-five ratio. I don't have an anticipation argument, Your Honor, because claim six only applies to my co-counsel for Watson. My client doesn't infringe claim six, according to this Court's opinion in the previous CARICA. So you're not prepared to answer any questions related to the anticipation? I am not, Your Honor. Or to claim six. Or to claim six. It doesn't apply to my client. I was going to. Well, I don't. Okay. I'm sorry. So, and he's not going to. Well, I wonder if he's going to change his mind now. I'll take a minute or two to answer those questions. All right. So you're only going to talk about the reissue claims? I'm only going to talk about the claims that are subject to the obviousness defense, not claim six. Claim six is also subject to the obviousness defense. But it's not. It doesn't apply to my client. You're talking about the reissue claims? Exactly right. Okay. Yeah. All right. So consisting, you want to go straight to consisting essentially of. That's right. So how does consisting essentially of, when you've got two active ingredients, one of which is a sedative, phenobarbital, how do you suddenly just yank them out of there? What happens? How does that work? Well, you're focusing just on Flick itself. But remember, we're arguing that the patent, this patent, this claim combination is obvious from not only Flick, but also from the German references. But here are the things that are absolutely undisputed. And this is a better case than Vicks-Richardson. In Vicks-Richardson, what this court held is, look, if the prior art says, give these two active ingredients to patients at the same time in two separate pills, it's obvious as a matter of law to combine them into a single pill. Wait, wait, no, no, no. That's what we have. But the prior art actually doesn't just say give them to them in two separate pills. It says it's a good thing and it's preferable always to give them in two separate pills because that way you can modify and slide the dosages as necessary in individual cases. How does that not teach away from combining them in a single pill where you would absolutely lose that benefit, which every one of those references highlights as one of the really great things? Three points. That argument ignores the fact that Flick itself is a fixed-dose combination. So the key prior art on Tramadol teaches a fixed-dose combination that allows none of the flexibility you're talking about. Point number two. But all those other references that you want me to use teach away from that very combination. So how does that not create at least a question of fact? Here's why it doesn't. Two reasons. I don't understand. You've got a whole mountain of references you want me to lump in, and they all teach away from the other thing. And this is on summary judgment. If this was after a trial and a fact finder had made this decision, a much different ball of wax. They don't try. Summary judgment. They do not teach away. Just keep into context what's going on. Let me make two more points. One is it's undisputed in the record that there are on the marketplace four fixed-dose combinations combining acetaminophen, acetaminophen in a weak opioid, four in the marketplace in the prior art. All these references are talking about is optimally additional flexibility in dosing is a good thing for patients. But that doesn't do anything for the market reality that pain management is always treated in fixed-dose pills. Whether you're talking about a single agent, Your Honor, or a combination of ingredients, when a pharmaceutical company sells to a broad market, they are reducing doctors' flexibility. It's always true. Mr. Counsel, you're saying a lot of words, but you're not actually answering my question or speaking to the issue. Why would you combine these references that don't have the teach away from a single pill combination? So why would you take these references and blend them together with flick on summary judgment as a matter of law? Because I'm suggesting, Your Honor, that these are not teaching away. They teach away. They do not teach away. How is that not a question of fact? What a reference discloses, what a reference teaches, is a question of fact. And clearly these references at least raise this possibility. Don't we give them the benefit of every inference on summary judgment? I think we have to look at the prior art as a whole, including the fact that it is… Once again, you're not answering my question. Don't we give them the benefit of inferences on summary judgment? The truth is yes, you do. The truth is good. Don't lie to me. So if we have to give them the benefit of inferences on summary judgment, wouldn't you agree that there's at least the possibility that these references teach away, that one of skill in the art could possibly conclude that they teach away from a single pill? No, Your Honor, I don't. Take a look at A3716. It's the Brinkman reference. A3716. It does not teach away, Your Honor. It actually screams for more fixed dose combinations. This exact argument was made in Vicks-Richardson and was rejected by this Court. The exact argument. The argument was the prior art, the expert said, hey, you need flexibility. That teaches away from a fixed dose combination. This Court rejected it. Brinkman, A3716. One oncological disadvantage is that there are few fixed combinations of analgesics on the market. There was, in fact, four for pain management, four fixed dose combinations. Ultracept was the fifth. So it was already in the marketplace. Then here's the sentence that Ortho relies on. For clinical pharmacological reasons, they are widely forbidden or have not been permitted without regard to the often very difficult compliance question concerning tumor patients. Compliance meaning, you know what, you're more likely to take your meds if it's one pill rather than two. So he's still recommending more fixed dose combinations. And then the very next sentence. However, those combinations can facilitate a reduction of the individual dosage of the components and thus reduce the risk considerably. So he is saying we need more fixed dose combinations for pain management than the four that are already out there. That is not an issue of fact. That is right from the prior art. You don't need a PhD to read and understand this. Brinkman is suggesting more fixed dose combinations. And it's not like, how can it be an invention the fifth time it comes along? There were four acetaminophen plus weak opioid fixed dose combinations on the marketplace before. What prior art references are you referring to? The four fixed dose combinations. It's in the record at 3449 to 50. All four. I'm sorry, A3449. Yes, I'm sorry, 3449. I think the list is on 50 in the chart. And this is a piece of prior art that's in the record. It is a piece of prior art in the record. Ortho largely ignores the fact that when they make this flexibility argument, the marketplace had already rejected that as a reason not to make fixed dose combinations. The marketplace had four of them. Tylex, Vicodin, Darvocet, and Tylenol with codeine. It's on a chart on page 50, Your Honor. Every single one combines acetaminophen with a weak opioid. And it's not just me saying this. It's Ortho's witnesses. Remember Dr. Min? He was a fellow, a research fellow at Ortho. By the way, in Brinkman, just so you know, one of your agents is administered in liquid drops and one is in milligrams. As far as I know, that implies two things that are not possible to contain in a single capsule. Well, the active ingredient in the drops is tramadol, and you can include the active ingredient. Brinkman discloses it in drops. True. Which would suggest that Brinkman is not saying it's in a single pill because you're not going to combine liquid back then. Clearly, Brinkman, because there wasn't a fixed-dose combination yet on the marketplace, was talking about using tramadol in its dosage form and giving it at the very same time as acetaminophen in the very ratios claimed in the patent. That's what he was doing. So I'm saying take this reference that says, you know, we need more fixed-dose combinations. Look at the prior art, where there's four fixed-dose combinations in the same category. Look at Flick, where he already puts them in a fixed-dose combination, and this renders the claim invention obvious for the same reason. My problem is it just sounds factual. It's not that I think that you're wrong. It just sounds factual. Well, Vicks, Vicks-Richardson addressed the exact same issue, exact same issue. This was prior to KSR. This was 1997. Exact same issue, and said, as a matter of law, combining these two ingredients into a single pill, when the art shows giving them separately in separate pills, is obvious. Matter of law. Vicks-Richardson. I just, am I wrong? I don't remember this Beaver reference. This is why you've caught me so off guard with this. No, Beaver. I'm now finally at 3449 to 350. I just don't remember this being highlighted or discussed in your briefs. It's throughout our briefs. We keep pointing out these four fixed-dose. I just don't remember any discussion of Beaver. We probably didn't say Beaver. We cited it when we cited the four fixed-dose combinations, but the reason you're probably not remembering it is because both Dr. Stansky and Ortho continue to ignore it. They never mention it, which, to me, tells a lot. It speaks volumes. I'm running, I'm getting close on time here. Look, Dr. Min, he says, this is not only obvious to combine these two ingredients into one tablet. He couldn't, this is Ortho's witness, he couldn't think of anyone who didn't think of the idea to put tramadol together with the acetaminophen into a single tablet. Couldn't think of anyone who didn't think of the idea. He said it was a natural phenomenon because acetaminophen had been successfully paired with other active ingredients so often. That was their witness who said that, and he volunteered it. Nobody even pressed him on it. How does Ortho get around this? They make two arguments, synergy and the teaching away argument, Your Honor, that we just discussed. On synergy, just to make sure we're clear about the analysis, it's not a claim element. So it's not part of the prima facie case of obviousness. It could only be potentially relevant as a secondary consideration. Synergy only could be relevant as a secondary consideration. And it doesn't, in our view, overcome the powerful prima facie case of obviousness here, as admitted by, for instance, Dr. Min. Two reasons. One is, synergy already existed in the prior art. There's nothing in the record to suggest that you get any... Does Beaver talk about tramadol? I'm looking at Beaver. No, it doesn't because it was discussing fixed combinations already in the marketplace in the prior art of acetaminophen plus weak opioids. Okay, so you're telling... That would be the invention. This is why Beaver is not that significant in my mind because when I went back and read it a million years ago, I realized Beaver didn't ever discuss tramadol. So you want me to take the notion of acetaminophen combined with other stuff, and you want me to take that and combine it with the German stuff and then combine it with Flick and then whoosh it all together and we get this, and hey, it's summary judgment. All I'm pointing out, Your Honor, is when the prior art says give active ingredient A and give active ingredient B to two patients, to patients in separate tablets, it is obvious under Richardson-Vicks to put them into a single tablet. And all I'm telling you is that reference right there shows you that these two precise categories of drugs had already been combined into a single tablet. Four times. Ultraset was the fifth. These two precise... Tramadol is not even discussed in Beaver. It's a weak opioid, just like four of the references that are in Beaver. Is there no unpredictability at all in chemistry? Well, there's certainly no unpredictability in when you give somebody these two ingredients in separate pills, there's no unpredictability about jamming them into one pill. Zero. If it's going to work when you give them in separate pills, it's going to work when you put them into a combination pill. There's been no argument to the contrary. Two points on synergy. It can't help as a secondary consideration because it already existed in the prior art. There's no evidence in the record that there's any greater synergy from a combination tablet than from co-administering these two ingredients as separate pills. Second, it's not surprising. We have the Flick patent, the Meyer reference, and even the 221 patent itself, they all discuss this belief that when you combine analgesics in two different categories, you can get synergy. Mr. Hirschman, you've got a moment. I'm running out of time. So two reasons for synergy. It's a pleasure, Co-Counsel. I'll argue his point. Thank you, Your Honor. John Northwood Watson. Thank you, Your Honors. I'd just like to make two points, if I might. First of all, following up on Judge Moore's question regarding the anticipation and Claim 6 original, we believe that if you can look at columns 11 and 12 of Flick, that... Example 22. Excuse me? 22? Example 22? Actually, there's example 22, and then the text under 22 is not part of 22 itself. And I'm looking at A3463, which is where Flick is. I'm there, but what column number? 11 and 12. Column 11, line... What line do you want to point me to? For... All you need to do is look at column 12, line 24 and 25, where it talks about... Preferably the 50 milligrams. Yes, ma'am. Yeah, in the context of example 22. Actually, that is not part of 22. If you read 22 stops right around line 54. How are we supposed to know that? Yeah, and wouldn't it be a question of fact, Counsel? You're a patent lawyer. You know these things, right? A prior art reference, what it discloses, isn't that a question of fact? No, ma'am. This is a sort of... Wait, what a prior art reference discloses is not a question of fact? This is the sort of thing that a district court judge can review and does review in claim construction, for instance, all the time. I didn't say they didn't review it. Is it a question of fact? No, it's not a question of fact. What a prior art reference discloses is not a question of fact? In this case, it is not because the teaching is clear and unambiguous. There are circumstances sometimes when it might be, but when you look at the information... Is claim construction a question of fact? I'm just curious. It's a matter of law. Is it always a matter of law? Claim construction is always a matter of law, though it can be based on facts. But things that are questions of fact can sometimes be questions of law. Well, you've misstated that. It's not based on fact. In fact, it is, but this court has said it isn't. It is a matter of law for the court to determine, and like claim construction, this is a very clear teaching. You have the preferred embodiment. But this court has said what a prior art reference discloses is a question of law? I'm not sure it has made a global statement in that regard. But in this case, where it is merely construing the language in a patent, like courts do on claim construction all the time, that would be a matter of law. That's perfectly within the ambit of a different... Construing the language of a patent. So this is a specification, and claim construction, as far as I know, generally pertains to construing claims, which is different. But anyway, I think we actually have a mountain of precedent that says what a prior art reference discloses is a question of fact, and I've never seen anything to the contrary. So my problem is, given that this is under the heading of Example 22, I have difficulty suddenly parsing it out and saying it's no longer part of Example 22. It's somehow its own individual entity. If you look, for instance, Your Honor, at line 64, it refers to Examples 17 to 22, and so clearly there's a transition. Wait, what column are you at? Column 11, line 64. And it begins there, if not above that, into a transition not specific to 22, but talking about general issues. And so at least as of column 11, line 64, you're in a general discussion that is applicable to all of the examples. No, it's applicable to Examples 17 through 22. Why would we surmise that it goes beyond that to 23? Well, in that paragraph it references those examples, Your Honor. And in the next paragraph? But when you get to the preferred embodiment, it is not limited to 17 to 22. What preferred embodiment? It says at line 24, oral administration of single doses between 25 and about 100 milligrams and preferably 50 milligrams or 75 milligrams. And so in that paragraph it's not limited to the above examples and it should be read to be part of Example 23. But again, even at the end of the day, it's a very strong obviousness case. In Boston Scientific, where two figures were side by side. And in that circumstance, this Court does not need to reach the issue of whether there's anticipation. Final point. Two points, Your Honor. We believe that while we agree entirely with Carrico as to the German references, that this Court can find obviousness as to the consistency We are here to talk about six and the other questions that they asked, and we've far exceeded the time. Thank you. Thank you very much. Mr. Keller. I was surprised to hear Carrico's counsel say that it's just not disputed that co-administration and putting things in the same pill are the same thing. It is absolutely disputed, and the expert testimony below is uncontroverted, that co-administration in separate dosage forms and putting things together in the same pill are not the same as a medical and pharmacological matter. And I'll refer the Court to Appendix Pages 1766-72, 1927-28, 3954-55, 1800-08. The body can respond differently to two active ingredients in one pill than it does to separate compositions. Now, as for the supposed prior art of these fixed dose combinations that were out there on the market... Are we talking about Beaver now? Yes. Was the first page you cited in the Appendix 1776? 1766. Oh, okay. And as for these four prior art combinations, they did not involve tramadol. And again, the record here is undisputed that tramadol is an atypical opiate. It does not behave like codeine. It does not behave like oxycodone. You cannot predict what a tramadol combination is going to do based on those others, certainly not on summary judgment. There was reference to Dr. Min's testimony. Dr. Min was an acetaminophen specialist. He worked for McNeil Labs, which is the maker of Tylenol. It was his job to try Tylenol with everything, or I should say use the generic acetaminophen with everything. He said that he and his company had a long history of combining acetaminophen with everything in the world, so it was just a natural phenomenon to try it with tramadol to see if it had beneficial effects. But as he also explained, he had no particular expectation that that combination would produce any beneficial effects. And he pointed out in his testimony that Grunenthal, the German company that had the patent on tramadol, he was asked whether they had thought about combining the two, and he said they had not. So when he said he doesn't know anybody who hadn't thought of it, he meant anybody at McNeil Labs, the acetaminophen company. Well, and Dr. Min's testimony might be tough for you, and if and when you get in front of a jury, I feel bad for you trying to find a way around it. But here, you have Stansky, who says something different, and so I would imagine your argument to us wouldn't be an attempt to rehabilitate Min, but that there is contradictory record evidence on this point, and as such, summary judgment can't be granted. I think even if you... I think to have a need to rehabilitate Min, you have to read it in the light most favorable to the movements, which isn't the way you do it. But even if you do that, then I think you get to the point that you're at, Your Honor, and that is there's contradictory evidence, and that's what trials are for, not summary judgment. Now, as for Richards and Vicks, the record in Richards and Vicks was very, very different. The record there was that doctors were taught in medical school and routinely prescribed ibuprofen and pseudoephedrine together. The prior art compositions, there was a prior art composition of, I think it was acetaminophen and pseudoephedrine, and the record in that case said that the two, that is ibuprofen and acetaminophen, for that purpose were interchangeable, and there was no reason to think there would be a different effect. Well, here the record is very different. Tramadol is not interchangeable with these other weak opioids that are out there. The other thing in Richards and Vicks, you also had evidence that another pharmaceutical company had made 30,000 of these tablets prior to the patent. So, again, that's evidence that we don't have here. The fact that the dosing flexibility argument didn't go anywhere in Richards and Vicks had to do with the fact that the product there was an over-the-counter product targeted at a large population for treatment of minor symptoms. Again, that's very different from what we've got here, where we've got drugs that have to be titrated carefully, require physician supervision, and are not over-the-counter drugs. Now, as for the argument about Column 11 of FLCC, Dr. Stansky testified that that passage, what the district court called the so-called various desired passage, clearly referred to Example 17-22, and it's right in the middle of a discussion of those examples. It talks about the active agents, but you've just followed a discussion of those examples where it talks about Compound A, which is one form of tramadol, Compound B, another form, Compound C. But his testimony is that one of skill in the art would read the 50-milligram, preferably, language to refer to Example 17-22. Exactly. And it's not an outlandish reading because, as I was just saying, it falls right in the middle of a discussion of Example 17. But then the district court did point to the language in the first paragraph in Column 13, right? Yes. And rely on that language as well. Right, right. But that language, Your Honor, I think, again, it is, and Dr. Stansky explained that as well, and he explained that that clearly is referring again to the forms, when it talks about activations and so forth, it's talking about the forms of tramadol as evidenced by the reference there to the esters and acid addition salts of tramadol, which is the whole subject of the preceding 12 columns, or 11 columns, I guess, of the patent. It's talking about forms of tramadol. It's also evidenced by the reference to the claims. I know my time is up, Your Honor. Thank you. Thank you. Case is submitted.